[Cite as *In re Estate of Cannon*, 2015-Ohio-390.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re Estate of William J.
Cannon, Deceased

Court of Appeals No. L-14-1069

Alvin C. Miller, et al.

Trial Court No. 2011 ADV 894

Appellees

v.

Jeanette E. Jensen, etc., et al.

**DECISION AND JUDGMENT**

Appellant

Decided:  January 30, 2015

* * * * *

Kevin A. Heban, R. Kent Murphree and John P. Lewandowski,
for appellees.

C. William Bair and Fan Zhang, for appellant.

* * * * *

**YARBROUGH, P.J.**

## I.  Introduction

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas, Probate Division.  The appeal challenges the trial court's finding that the decedent,

William J. Cannon ("Bill"), was incompetent and subject to undue influence when he

executed five inter vivos transfers to his children, and the trial court's order that the transferred assets be returned to the William Cannon estate. For the following reasons, we affirm.

## A. Facts and Procedural Background

{¶ 2} Bill and Joyce Cannon married in 1983. They had no children together, but Bill had four children from a previous marriage: Charlene Fausze, William Cannon, Jr., Phillip Cannon, and Jeanette Jensen. During the course of their marriage, Bill and Joyce executed several estate plans. Each of those plans provided that upon the death of one of them, the entire estate would pass to the other. Upon the death of the survivor, the estate would be distributed 50 percent to Joyce's next-of-kin, and 50 percent to Bill's next-of-kin.

{¶ 3} Joyce died in December 2007. In January 2008, Bill executed a general power of attorney naming Jeanette as his agent. Shortly thereafter, in February 2008, Jeanette moved in with Bill. Jeanette continued to live with Bill until his death on January 3, 2010. In the months before his death, beginning around March 2009, Bill transferred approximately $760,000 in assets to his children. He transferred $144,000 to Jeanette by naming her the payable on death beneficiary of his financial accounts. He transferred $160,000 to Phillip, $160,000 to William, Jr., and $170,000 to Carl Fausze, the son of Charlene, so that each of them could purchase real estate. Finally, he deeded his marital home, valued at $128,000, to his four children. These transactions had the effect of reducing the value of Bill's estate to approximately $50,000.

2.

{¶ 4} Following Bill's death, appellees, Alvin Miller and Loretta Seward, Joyce's siblings, filed exceptions to the inventory regarding the transfers to Phillip, William, Jr., and Carl. There was some question as to whether those transfers were loans or gifts. At the time of the transfer, Bill and his children executed a document that Jeanette had found on the internet that described the transaction as a loan. However, the borrower was required to make payments on the loan by depositing money into a bank account in his or her own name. Further, according to the documents, upon the death of Bill, the borrowers were required to pay $40,000 to each of Bill's other children. No demand for those payments has been made.

{¶ 5} The exceptions to the inventory ultimately led appellees to file a complaint to set aside all of the inter vivos transfers on the grounds that Bill was incompetent and subject to undue influence at the time of those transfers. The matter proceeded to a three-day bench trial.

{¶ 6} As support for their case, appellees offered the expert medical testimony of Drs. Glenn Dregansky and Thomas Sherman. Dregansky was Bill's primary care physician. He testified that by the beginning of 2006, Bill was diagnosed with multi-stroke dementia. Dregansky's records from April 2006 reveal that Joyce was concerned that Bill's memory was continuing to get worse. Following his examination of Bill, Dregansky prescribed Aricept, which is a drug used to treat dementia. Thereafter, in November 2006, Bill was injured when he stuck his hand under a lawn mower while it was still running. Dregansky testified that people with intact cognitive functioning

3.

generally do not stick their hands into lawn mowers, although he offered that he has seen people with perfectly normal cognitive function do such things.

{¶ 7} In June 2007, Dregansky again saw Bill. He testified that at that exam he noted that Bill was suffering from cognitive dysfunction. Dregansky explained that Bill had difficulty with short-term memory. In December 2007, Dregansky noted that Bill had stable dementia, which he stated meant that Bill's dementia was not rapidly progressing. Notably, the December 2007 visit preceded Joyce's trip to the hospital to have surgery to remove lung cancer. Dregansky and Joyce felt at the time that Bill could not be by himself and that he needed someone to watch him while Joyce was recovering. Joyce died unexpectedly as a result of complications during that surgery.

{¶ 8} Dregansky next saw Bill in June 2008, and following that, in December 2008. At the December 2008 visit, Dregansky noted that Bill's mental status exam revealed poor memory, poor judgment, and obvious cognitive impairment. In May 2009, Dregansky again saw Bill, and noted that Bill was "pleasantly demented," meaning that he was demented, but was not surly or combative.

{¶ 9} Ultimately, Dregansky testified that, in his expert medical opinion, Bill lacked the capacity during the last year of his life to make good judgments and that he did not have the capacity to understand the scope and effect of gifting more than $700,000 worth of assets. Furthermore, Dregansky testified that, in his expert medical opinion, due to Bill's cognitive dysfunction, it would have been fairly easy to manipulate him.

4.

{¶ 10} Sherman also testified as a medical expert, qualified in the fields of psychiatry and forensic psychiatry. Sherman did not examine Bill, but performed a "psychiatric autopsy" in which he reviewed Bill's medical records from Dregansky, Flower Hospital, St. Luke's Hospital, and Toledo Hospital. Sherman also reviewed Jeanette's deposition testimony. In particular, Sherman noted that when Bill went to St. Luke's Hospital in 2008 with chest pains, the emergency room doctor recorded that Bill was a "poor historian," meaning he was unable to give an accurate medical history. In addition, the dietician at the time noted that Bill was confused, so the dietician gave the packet of information to Bill's family members. Sherman found these recordings relevant because it confirmed Dregansky's report of dementia. Based on his review, Sherman opined, to a reasonable degree of medical certainty, that Bill lacked the competency to be able to conduct the financial transactions in 2009 that divested his estate of over $700,000.

{¶ 11} In addition to Drs. Dregansky and Sherman, appellees offered their own testimony, as well as the testimony of Joyce's supervisor, Carol Jones, and the testimony of Bill's estate planning attorney, James Dettinger. Loretta testified that she used to travel with Bill and Joyce frequently, and that they would spend all of the holidays together. She then testified that the only time she saw Bill after Joyce's funeral was in June 2008, and at that time, Bill did not recognize her until after she gave him several hints.

5.

{¶ 12} Similarly, Alvin testified regarding the last time he saw Bill. In May 2008, Bill called Alvin's house to let Alvin know that there was a hospital bill for him to pick up. Alvin stopped by the next day and asked Bill how he was doing. Bill responded that he was doing okay, but said, "you know I lost my wife." Alvin replied, "I know Bill, Joyce was my sister." Alvin testified that when he inquired about the hospital bill, Bill stated that he did not have a bill, and then said, "Joyce isn't here right now." Alvin testified that he did not talk to Bill after that day because "if he didn't know me, in May of 2008, I didn't think there was too much sense of me to keep going back."

{¶ 13} Carol Jones testified that she was Joyce's supervisor, and had met Bill on a few occasions. Jones stated that Joyce would sometimes come into work on Saturdays and she would bring Bill because she did not want to leave him alone. While Joyce worked, Bill would sit at a table erasing cassette tapes. Jones also testified that she took Joyce to some of her oncologist appointments because Joyce felt that Bill did not understand where he was or why she was going to the doctor. Finally, Jones stated that at Joyce's funeral, she felt that Bill did not remember who she was or that he understood what was going on.

{¶ 14} James Dettinger testified that he prepared the estate planning documents for Bill and Joyce, and had the opportunity to get to know them over the years. He testified that in 2007, he noticed Bill was having difficulty with certain recollections. Dettinger noted that although he was confident Bill was competent to sign the will, he was concerned about Bill's capacity. Within 60 days after Joyce's death, Dettinger

6.

noticed on several occasions that Bill referred to Jeanette as his wife.  Dettinger testified that by May 2008, Bill could not understand the details of his assets.  He concluded that in his opinion, based on his observations, Bill could not understand the nature and consequence of gifting more than $700,000 in the last year of his life.  Further, Dettinger testified that, but for the influence of Jeanette, Bill would not have transferred that amount of money in the last year of his life.

{¶ 15} The defendants, for their part, elicited the testimony of Jeanette, Phillip, and William, Jr., as well as the testimony of Bill's neighbors, Mildred Duncan and Sandra Bethel, and the testimony of Carl's real estate agent, Jody Kalte.

{¶ 16} Jeanette testified that immediately following Joyce's death, she would bring Bill over to her house to spend the night.  During the day, Bill would be at his own home, and was fully capable of keeping the house clean and doing chores like shoveling the driveway.  Towards the end of February 2008, Jeanette began having marital problems and her house was going into foreclosure.  She testified that Bill offered that she could move in with him.  Jeanette stated that in the beginning, Bill handled his own finances and paid the bills himself, but after some time, the arthritis in his hand began to bother him, so he would have Jeanette sign the checks.  She testified that Bill nonetheless understood what was going on and would be at the table when the bills were paid.

{¶ 17} Jeanette then testified that in March 2009, Bill wanted to transfer his house to his children.  She attempted to contact Jim Dettinger, but he was unavailable, so Jeanette took Bill to see a different attorney, John Wagoner, who had done some work for

7.

Jeanette in the past. Jeanette, Bill, and John Wagoner met twice, and at the second meeting, Bill executed the quitclaim deed.

{¶ 18} Following the transfer of his house, Bill expressed a desire to give money to his children so that they could buy houses. Jeanette testified that, in doing this, Bill wanted to help his kids build good long-term financial decision-making skills. Bill asked Jeanette to help him get something in writing that would require that the money be used to buy real estate. Jeanette located some forms on the internet and presented them to Bill, who then requested that certain modifications be made. Ultimately, the agreements were executed. Although Bill signed the documents himself, Jeanette also signed as Bill's agent. Jeanette testified that she signed them because Bill asked her to do so.

{¶ 19} Regarding the circumstances surrounding her designation as the payable on death beneficiary of Bill's financial accounts, Jeanette testified that Bill often would receive a notification in the mail that a certificate of deposit was maturing. He would then ask Jeanette if she would like to come along while he changed the account. She testified that sometimes she would accompany her father, and sometimes she would not. Jeanette stated that the payable on death beneficiary designations were made over a period of time beginning in the spring of 2008, and ending in the fall of 2009. From Jeanette's observations, Bill was competent to execute the financial transactions that occurred in 2008 and 2009.

{¶ 20} Aside from testifying about the financial transactions, Jeanette also offered that she consistently spent time with Bill prior to Joyce's death. She also testified that

8.

Bill spent lots of time with his family and enjoyed seeing his children and grandchildren. According to Jeanette, Bill was never unable to remember the names of his children and grandchildren. Further, she testified that Bill remained active, and was capable of driving himself around and taking care of his house and yard.

{¶ 21} Phillip testified mostly about his relationship with Bill. Phillip stated that he visited Bill regularly, but that he would have to schedule times to visit when Joyce was not around because Joyce did not care for him or his siblings. Nevertheless, he and Bill enjoyed a good relationship. During one of his visits, Phillip mentioned that he had to move out of the house he was currently living in because the landlord needed the house for his own use. It was at that time, around April 2009, that Bill offered to help Phillip by giving him $160,000 to be used to purchase a home. Phillip testified that Bill wanted him to sign the loan document because Phillip had financial trouble in the past, and Bill wanted to make sure the money went to the house and not towards something else.

{¶ 22} William, Jr., also testified regarding his relationship with Bill, and how he would often see him several times a week. He stated that his dad was capable of carrying on an intelligent conversation with him even up to shortly before Bill's death. Concerning the $160,000 gift/loan, William, Jr., testified that Bill drove over to his apartment and offered him the same deal that he offered Phillip. William, Jr., used some of that money to purchase a house for $42,500, and to make improvements to it. The rest of the money was used to pay off medical bills. William, Jr., testified that Bill approved of his use of the money to buy and renovate the house and to pay the medical bills. Like

9.

Phillip, William, Jr., also had his share of financial problems, and had declared bankruptcy in 2005.

{¶ 23} Mildred Duncan also offered her observations of Bill. Mildred lived a couple of houses down from Bill for approximately 20 years. She testified that she would often see him go out to get his mail, or drive away in his car. Mildred had limited interaction with Bill, and she admitted that she did not talk to him all that much, but when she did talk to him during the period after 2006, she observed that he seemed to be aware of who she was and what was going on at the time. Mildred also testified that she never saw Jeanette attempt to control Bill or tell him what to do.

{¶ 24} Another of Bill's longtime neighbors, Sandra Bethel, testified that for the four months after Joyce died, she would take meals over to Bill once a week. Sandra would just make small talk with Bill, but she stated that he always knew who she was. During the summer of 2009, Sandra saw Bill on a few occasions, and noticed that he was older, but otherwise did not notice anything abnormal about his behavior. Like Mildred, Sandra testified that she never saw Jeanette attempt to influence his behavior in any way.

{¶ 25} Finally, the court heard the testimony of Jody Kalte, Carl's realtor. Jody testified that she had the opportunity to meet Bill on numerous occasions when she was showing houses to Carl. Carl was using the money provided by Bill to purchase a new house. Like Phillip and William, Jr., Carl had experienced some financial difficulty. His previous home was under water, and he was working towards a short sale. For that reason, Jody testified that the house was going to be purchased in Jeanette's name with

the idea that it would eventually be transferred to Carl. Jody stated that Bill was pleasant, and would sometimes ask questions about the house, but seemed more concerned about whether Carl and his wife liked it. Jody testified that she never saw Carl or Jeanette attempt to influence or control Bill.

{¶ 26} Following the testimony, and the parties' submission of written closing arguments, the trial court entered its judgment finding that Bill was subject to undue influence. The trial court noted the testimony of Drs. Dregansky and Sherman when determining that Bill was incompetent and susceptible to undue influence. The trial court also noted that Jeanette had the opportunity to unduly influence Bill by virtue of residing with him and being his power of attorney.

{¶ 27} Further, the trial court specifically found that Jeanette actually exerted undue influence upon Bill. As support for this finding, the trial court relied on the fact that Jeanette drafted the "loan agreements" and signed each of them as Bill's power of attorney. The court also found suspect the fact that the transactions changed from loans to gifts after appellees filed exceptions to the inventory, particularly since each of the borrowers had either filed for bankruptcy, lost a home, or was in the middle of a foreclosure. In addition, the court found the terms of the loan transactions suspect because each was interest free and required the borrower to make payments into his own account, and Jeanette, the drafter of the agreements, was entitled to a $40,000 payment from each borrower upon Bill's death. The trial court also relied on the fact that Jeanette wrote checks for Bill, signed the real estate purchase contracts for him, and drafted the

11.

loan documents.  Finally, the trial court noted that when Bill's home was transferred to his children, Jeanette took him to her attorney as opposed to Bill's long-time attorney, and similarly took him to her accountant instead of his longstanding accountant.

{¶ 28} Accordingly, upon its finding of undue influence, the trial court set aside the loan transactions, the quitclaim deed, and the beneficiary designations.  The court ordered that the transferred assets be returned to Bill's estate, and imposed a constructive trust upon all assets currently held by the defendants that were obtained with proceeds from those transferred assets.

### B.  Assignments of Error

{¶ 29} Jeanette[1] has timely appealed the trial court's decision, and raises five assignments of error for our review:

> I.  THE TRIAL COURT ERRED AS A MATTER OF LAW IN ITS APPLICATION OF THE STANDARD FOR EVALUATING TESTIMONY ON COMPETENCE.

> II.  WHEN THE TRIAL COURT ERRED AS A MATTER OF LAW IN ITS APPLICATION OF THE STANDARD FOR EVALUATING TESTIMONY ON COMPETENCE, SUCH ERROR RESULTED IN THE IMPROPER WEIGHING OF OFFERED TESTIMONY.

---

[1] All of Bill's children, and his grandchild, Carl Fausze, were named as defendants in the trial court.  However, only Jeanette was listed on the notice of appeal.  Thus, Jeanette is the only appellant in this case.

12.

III.  THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO SHIFT THE BURDEN OF PROOF OF EXERCISE OF UNDUE INFLUENCE AS BETWEEN A FIDUCIARY/DEFENDANT AND A CHALLENGER/PLAINTIFF IN CONSIDERING THE PURPORTED EVIDENCE OF UNDUE INFLUENCE.

IV.  THE TRIAL COURT ERRED IN MAKING INFERENCES FROM FACTS IN EVIDENCE REGARDING THE ACTUAL EXERTION OF UNDUE INFLUENCE RATHER THAN APPLYING THE FACTS THEMSELVES.

V.  THE TRIAL COURT ERRED IN FAILING TO ALLOCATE FAULT AS BETWEEN THE VARIOUS DEFENDANTS WITH RESPECT TO THE EXERCISE OF UNDUE INFLUENCE.

## II.  Analysis

{¶ 30} We review judgments from the trial court following a bench trial under the manifest weight of the evidence standard.  *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-22.  Under that standard, when reviewing the lower court's decision, we must weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.  *Id.* at ¶ 20.  In so

13.

doing, we "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

> [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

## A. Competency

**{¶ 31}** Appellant argues her first and second assignments of error together, and we will address them in the same manner. In her argument, appellant contends that the trial court failed to consider all of the evidence when deciding that Bill was incompetent.

**{¶ 32}** When evaluating the competence of a donor making an inter vivos gift, we have applied the same test as that for testamentary capacity. *In re Estate of Lucitte*, 6th Dist. Lucas No. L-10-1136, 2012-Ohio-390, ¶ 61. That test examines whether

> the testator has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; second, to comprehend generally the nature and extent of his property; third, to hold in his mind the names and identity of those who have natural claims upon his bounty; fourth, to be

14.

able to appreciate his relation to the members of his family. *Niemes v.
Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the
syllabus.

{¶ 33} Here, appellant claims the trial court ignored four pieces of testimony:
(1) Phil's testimony that Bill wanted the gifted money to be used for the specific purpose
of buying a home free and clear, and that Bill required Phil to prove that he was paying
taxes on the home; (2) appellant's own testimony that the transactions were done at Bill's
direction and that the loan/gift forms contained Bill's desired conditions; (3) Kalte's
testimony regarding his lucidity; and (4) Duncan's and Bethel's observation that Bill was
attentive and rational in the summer of 2009. Appellant concludes that the trial court's
dismissal of this evidence effectively means that the court gave conclusive force to the
expert's testimony regarding Bill's competency. Disagreeing with the trial court's result,
appellant then cites several cases in which a trial court found against the party providing
medical testimony concerning the decedent's incompetence. Appellant concludes that
the trial court lost its way when it favored the testimony of Dregansky and Dettinger,
neither of whom were present when the transactions occurred, over the testimony of
appellant, Kalte, Duncan, and Bethel, whose observations of Bill occurred more
contemporaneously with the execution of the transactions.

{¶ 34} Upon our consideration of the entire record, we disagree with appellant's
conclusion that the trial court lost its way. Although appellant points out the
contradictory evidence, the trial court's decision was nonetheless supported by the

15.

testimony from multiple witnesses. Dregansky, who had treated Bill for years, testified that in his opinion Bill's dementia prevented him from having the capacity to understand the scope and effect of gifting more than $700,000. Sherman gave his expert opinion based on his review of Bill's medical records that Bill lacked the competency to execute the disputed financial transactions. Dettinger testified that by May 2008, Bill did not understand the details of his assets, and on several occasions had referred to Jeanette as his wife. Furthermore, Loretta, Alvin, and Jones all testified to Bill's confusion and inability to remember who they were. Therefore, in light of this evidence, we cannot say that the trial court created such a manifest miscarriage of justice that the decision must be reversed. Accordingly, we hold that the trial court's finding that Bill was incompetent is not against the manifest weight of the evidence.

{¶ 35} Appellant's first and second assignments of error are not well-taken.

### B. Undue Influence

{¶ 36} Appellant's third and fourth assignments of error pertain to the trial court's analysis of the claim of undue influence. Thus, we will address them together.

{¶ 37} In her third assignment of error, appellant argues that the trial court failed to follow the burden-shifting paradigm that creates a presumption of undue influence when the donee has a fiduciary relationship with the donor. Further, appellant argues the trial court erred when it failed to find that she produced evidence sufficient to dispel the presumption of undue influence. In her fourth assignment of error, appellant contends that the trial court erred when it inferred that undue influence must have occurred.

16.

{¶ 38} To prove undue influence, the plaintiff must establish "a susceptible testator, another's opportunity to exert [undue influence], the fact of improper influence exerted or attempted, and the result showing the effect of such influence." *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962). "Where a confidential or fiduciary relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee." *Studniewski v. Krzyzanowski*, 65 Ohio App.3d 628, 632, 584 N.E.2d 1297 (6th Dist.1989), citing *Willis v. Baker*, 75 Ohio St. 291, 79 N.E. 466 (1906). "In such circumstances a presumption arises, and the party with the superior position must go forward with proof on the issue of undue influence and fairness of the transaction while the party attacking a completed gift on that basis retains the ultimate burden of proving undue influence by clear and convincing evidence." *Id.*

{¶ 39} At the outset, we agree with appellant that the trial court, in its judgment entry, did not apply the burden-shifting analysis that arises by virtue of appellant's position as Bill's attorney-in-fact. Nevertheless, the trial court's omission did not prejudice appellant since the court ultimately found that undue influence affirmatively occurred.

{¶ 40} Turning to the elements of undue influence, we find that the evidence shows that Bill was susceptible to undue influence based on Dregansky's testimony that Bill would have been easy to manipulate, and based on our discussion above regarding Bill's competence. Further, it is clear that appellant had the opportunity to exert undue

17.

influence over Bill since she was living with him and was his primary caretaker. It is equally clear that the result shows the effect of undue influence as all of Bill's children benefitted financially to the exclusion of appellees. The remaining issue then, and the one on which appellant focuses, is whether undue influence was actually exerted.

{¶ 41} On this point, appellant proposes that the trial court erred in reaching its conclusion in light of the absence of any testimony that appellant controlled or directed Bill. Appellant states that the trial court erroneously inferred that undue influence must have occurred because the transactions benefitted Bill's children and she was the one who prepared the documents at Bill's request as his attorney-in-fact.

{¶ 42} We disagree. Sherman's testimony that Bill would have been unable to generate any new ideas at that stage of his life, and Dettinger's testimony that but for the influence of Jeanette, Bill would not have transferred the money, support the trial court's finding. Moreover, the circumstances surrounding the transfers themselves also support the trial court's finding. Bill had a long-established estate plan that split the assets between his next-of-kin and Joyce's next of kin. Joyce died unexpectedly, and shortly thereafter Jeanette moved in with Bill. Approximately one and one-half years later, Bill, an 85-year-old man with dementia, executed three separate transactions transferring $490,000 total to William, Jr., Phillip, and Carl, each of whom had experienced financial difficulty in the recent past. The transactions were designated as loans, but in reality were gifts since they were interest free and there was no provision for repayment to Bill. Around the same time, Bill also changed the beneficiary designations on his accounts

18.

totaling approximately $144,000 to name Jeanette as the payable on death beneficiary. Furthermore, Bill transferred the deed to his marital home to his four children after meeting with Jeanette's attorney, not Bill's longtime attorney. The result of these transactions operated to divest Bill of nearly all of his assets. The trial court heard all of this testimony and found that the transactions must have been a result of Jeanette's undue influence. We do not find that this conclusion constitutes such a miscarriage of justice that the judgment must be reversed. Therefore, we hold that the trial court's judgment is not against the manifest weight of the evidence.

{¶ 43} Accordingly, appellant's third and fourth assignments of error are not well-taken.

### C. Allocation of Fault

{¶ 44} In her fifth assignment of error, appellant argues that the trial court erred by failing to allocate fault amongst the defendants. She contends that the trial court's judgment leaves unresolved whether the defendants are jointly and severally liable for repayment of the assets, or whether each defendant is only responsible for the assets transferred to him or her.

{¶ 45} We find appellant's argument to be without merit. The trial court did not find the defendants liable for a tort, but rather found that transactions that depleted what would have been estate assets must be set aside because they were invalid. The court therefore ordered that those funds be returned to the estate. Where those funds had already been converted into other assets, the court imposed a constructive trust over those

19.

assets to protect the assets from being divested before they could be administered within the estate.[2] Liability simply was not an issue before the trial court in this proceeding. Accordingly, appellant's fifth assignment of error is not well-taken.

## III. Conclusion

**{¶ 46}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Probate Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

---

[2] "A constructive trust is a 'trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.'" *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 18, quoting *Ferguson v. Owens*, 9 Ohio St.3d 223, 225, 459 N.E.2d 1293 (1984).

Arlene Singer, J.                                         _____

                                                                 JUDGE

Thomas J. Osowik, J.

                                         _____

Stephen A. Yarbrough, P.J.                                  JUDGE
CONCUR.

                                         _____

                                                                  JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.